HUISKAMP et al. v. WEST et al.

WEST et al. v. HUISKAMP et al.

(*Circuit Court, N. D. Illinois.* July 29, 1891.)

1. CORPORATIONS—STOCK—ISSUE TO OFFICER.

A copartnership was formed to buy certain property, thereafter to be conveyed to a corporation to be formed, and stock issued to each partner at $70 per share, of the value of $100 per share, according to the capital contributed. One partner, who became president of the corporation, was to contribute $490,000. He issued stock to himself accordingly, but in fact only contributed $133,000, and gave notes for the balance, which he afterwards paid with the corporation's funds. *Held,* that the issue of stock by the president to himself over the amount actually paid for with his own money was fraudulent.

2. PARTNERSHIP—RIGHTS OF PARTNERS.

Where a partner in the firm performs services of the value of $10,000 for the company in the purchase of property, and is permitted to retain title to a lot which he represents is worth only about that amount, the other partners being ignorant of its value, when in fact it is worth $40,000, the latter may have a decree against the partner for their *pro rata* interest under the partnership.

3. PLEDGE—SALE BY ASSIGNEE—NOTICE.

The fact that a pledgee is authorized to sell stock pledged, before maturity of the debt, without notice, in the event of the security depreciating in value, does not authorize a stockholder of the corporation, who has purchased the debt secured, to sell the pledge before maturity without notice, because he claimed the stock was fraudulently issued.

In Equity. Bill by H. C. Huiskamp and others against James J. West and others for an accounting.

*Trumbull, Willits, Robbins & Trumbull, A. W. Bulkley,* and *E. E. Gray,* for complainants.

*John M. Jewett, L. H. Bisbee,* and *Flower, Smith & Musgrave,* for defendants.

BLODGETT, J. The bill in this case seeks an accounting as to the ownership of the stock of the Chicago Times Company, a corporation organized under the laws of the state of Illinois. The material allegations of the bill are: That the complainants are, each of them, stockholders in the company. That the capital stock of the company was, by its articles of incorporation, fixed at $1,000,000, to be divided into shares of $100 each. That for many years prior to the organization of the company the late Wilbur F. Storey, of the city of Chicago, had been the publisher and proprietor of the newspaper known as the "Chicago Times." That in the autumn of the year 1887 defendant West, together with Clinton A. Snowden agreed with complainants to purchase from the widow and heirs of Mr. Storey all the property, real and personal, belonging to Mr. Storey's estate, including the Times newspaper, which purchase was to be for the benefit of complainants and said West and Snowden; and that on the consummation of such purchase a corporation should be organized for the purpose of publishing the Chicago Times, the capital whereof should be owned by complainants and said West and Snowden. That, at the time such agreement was made, West and Snowden and complainants were the owners of all but 125 shares of the

capital stock of the Chicago Mail Company, an Illinois corporation, with a capital stock of $150,000, divided into 1,500 shares of $100 each, engaged in the business of publishing the Chicago Mail newspaper in the city of Chicago; and it was agreed between complainants and West and Snowden that the property and good-will of the Mail Company should be transferred to and owned by the new company so to be formed, and that the owners of the capital stock of the Mail Company should receive for their stock in the Mail Company an equal number of shares in the stock of the Times Company. That, in pursuance of said agreement, West and Snowden purchased the whole property belonging to the estate of Mr. Storey from his widow and heirs, which consisted of much valuable real estate, and also the Chicago Times newspaper; and that all the said estate was conveyed and delivered to defendant West about the 24th day of December, 1887. That the purchase price of said property, real and personal, was $575,000, of which $300,000 was to be paid to the heirs, $190,000 of which was to be paid by the reconveyance to them of part of the real estate so purchased from the estate, and the remaining sum of $110,000 was to be paid in cash. That Mrs. Storey, the widow, was to be paid $275,000 in cash for her interest in said estate. That after the purchase of said property, and on or about the 30th day of December, 1887, the Chicago Times Company was organized, and a board of directors elected. That on the 5th of January, 1888, said board of directors met, and the defendant West was elected president, and Clinton A. Snowden secretary, of said company, and by-laws for the government of said corporation were adopted. That at the same meeting of the board of directors it was ordered that the lot and building thereon, known as the "Chicago Times Building," with all the personal property therein contained, and the Times newspaper, with all its presses, franchises, good-will, and the property used in the printing and publication thereof, should be conveyed to the said Times Company for the sum of $850,000, to be paid for in the capital stock of said company, of which 1 share should be issued to Frank S. Weigley, 1,000 shares to Clinton A. Snowden, and 7,499 shares to defendant West, the said West receiving a portion of said shares for and in behalf of complainants; and that said West soon thereafter transferred, conveyed, and delivered said property to the Times Company, and stock of the Times Company was duly issued therefor, pursuant to the direction of said board of directors. That, at or about the same time, all the property of the Chicago Mail Company was transferred and delivered to the Times Company, and the same was paid for by the issue and delivery of Times Company capital stock to the holders of the Mail Company stock, share for share. That there was issued to defendant West 925 shares of Times stock, as a stockholder in the Mail Company, and to the said Snowden 200 shares of Times stock, as a stockholder in the Mail Company, and to complainants 375 shares of Times stock, as stockholders in the Mail Company. That, although 925 shares of Times stock were issued to defendant West in alleged exchange for Mail Company stock held by him, 125 shares were taken by West as representing stock held by other per-

sons than said West; and that such other stockholders in the Mail Company have never surrendered their stock in the Mail Company, and defendant West has never delivered to them the 125 shares of Times Company stock so issued to himself, ostensibly for them, but still wrongfully holds said 125 shares of Times Company stock.

The bill further charges that it was agreed between complainants and West that the sum of $700,000 should be invested for the purpose of purchasing the property of the Storey estate, giving to the proposed Chicago Times Company sufficient capital to pay up the debts of the Times newspaper and carry on its business. That complainants were to furnish three-tenths of said amount, and defendants West and Snowden were to furnish seven-tenths thereof. That complainants required of West a statement of his assets, that they might be able to determine for themselves whether he was financially able to carry out his part of the proposed business. That he thereupon made a statement which showed that he then had $365,000 in good securities, stocks, and bonds; and that, relying upon the truth of this statement, complainants furnished and paid, including 375 shares of Mail Company stock, the sum of $210,000, which was three-tenths of the proposed capital to be paid in to the said Times Company for the issue to them of three-tenths of the stock thereof. The bill charges that West did not, in fact, contribute any means of his own to the purchase of the property of the Storey estate. That he had no money of his own to contribute to the enterprise. That instead of paying for said property, as he had agreed to do, and as he had informed complainants he had done, he obtained credit from the heirs of the Storey estate for the sum of $110,000, which he had agreed to pay. for in cash, for which the promissory notes of West and Snowden were given to said heirs, or for their benefit. That $10,000 of said amount still remains unpaid, and $100,000 paid by West was paid by him from moneys belonging to the Times Company, and not out of his individual means. That, of the moneys paid Mrs. Storey, complainants advanced at the time of the purchase $150,000, and subsequently the further sum of $22,500; making in all the money advanced by complainants,—the sum of $172,500. That West paid Mrs. Storey the sum of $62,500 in money, which was borrowed by him from other persons, and secured the payment of $40,000 to Mrs. Storey by the notes of West and Snowden, and a mortgage upon certain property which had been acquired from the Storey estate; and that, of this $40,000, $19,000 yet remains unpaid. It is further charged by the bill that in April, 1889, the Times Company sold the Times lot and building thereon for $220,000 over and above incumbrances thereon; all of which proceeds came to the hands of West, and were deposited in bank to the credit of the Times Company. That West had, up to that time, been the sole manager of the affairs and business of the Times newspaper, and represented to complainants that the indebtedness of the Times Company was then only $40,000; and it was then agreed that the said $220,000 should be used as follows: (1) To pay all existing debts of the company; (2) $40,000 to be placed in bank to the

credit of the Times Company; (3) the remainder to be applied to the payment of the individual indebtedness of West, guarantied by any of the complainants, for which amount stock of the Times Company was to be delivered to the treasurer of the company at the rate of 60 cents on a dollar. The bill further charges that West's statement as to the indebtedness of the company being only $40,000 was false; that its actual indebtedness at that time was upwards of $250,000; that upwards of $100,000 of the proceeds of the sale of the Times building and lot were applied by West in the payment of his individual indebtedness, although, at that time, West was largely indebted to the Times Company, and only part of the indebtedness of West guarantied by complainants was paid by West out of said proceeds. The bill further charges that the cost of all the property purchased of the Storey estate, less that which was paid the heirs in land, was $390,000,—$385,000 paid Mrs. Storey and the heirs, and $5,000 commissions; that, of the property so purchased, West retained a lot of the value of $50,000, which he has never conveyed to the Times Company or to complainants, and that the indebtedness which West incurred in the purchase of the property of the Storey estate has been paid by West out of the proceeds of the Times Company, and that West has paid for no stock in the Times Company, save that which represents his Mail Company stock. The bill further charges that West has purchased all the interest of Clinton A. Snowden in the Times stock and property, and that none of the Times Company stock issued to either West or Snowden was ever paid for, except that issued on account of Mail Company stock; that, as president of the Times Company, West has overissued the stock of the company to an amount exceeding $100,000, and pledged a portion of said fraudulent stock as security for his personal debts, and West is not now the owner of any stock in the Times Company. The bill further charges that in July, 1889, West borrowed of Norman B. Ream and others the sum of $100,000, and gave his note therefor to Ream as trustee, and, as security for the payment of said note, pledged 5,001 shares of the capital stock of the Times Company, issued by him as president of the company to himself, with power to the pledgee or the holder of said note to sell said stock in case of default in the payment of the note, or in case the owners or holders of said note should feel themselves insecure, or said stock should depreciate in value; and that, after pledging said stock as aforesaid, West assigned and transferred his equity in said stock to the complainants J. N. Irwin and George D. Rand as collateral security for indebtedness held by said Rand and Irwin against said West to the amount of $64,000 and over. The bill prays that a decree may be entered finding what of the stock of the company issued by West is void, and ordering a cancellation thereof, and decreeing what of said stock is valid.

The answer of defendant West denies that he purchased the property of the Storey estate under any agreement that the said purchase should be for the benefit of the complainants and himself and Clinton A. Snowden, but insists that such purchase was made solely in the interest of

defendant West and said Snowden. He admits that, after he had made such purchase, he agreed with complainants to join with them in the formation of a corporation, to be called the "Chicago Times Company," with a capital stock of 10,000 shares of $100 each; and that the Times newspaper, and the property employed in the publication thereof, and the Times building, and lot on which the said building stood, as well as the Chicago Mail property, should be conveyed to said Times Company. The answer further insists that he (West) had ample means and credit with which to purchase the Storey estate property; admits the sale of the Times building and lot, and that the proceeds came to his hands; but insists that he applied all of said proceeds to the payment of the debts of the Times Company, except about $40,000 which he applied to his own use by the consent of complainants, and that he has, with the consent of complainants, turned in to the treasury of the Times Company the stock of the company held by him at the rate of 60 per cent., for which he has received a credit of $40,950. The answer further insists that he has paid the Storey heirs $100,000, and that the remaining $10,000 has been paid by Frank S. Weigley under an arrangement between himself and Weigley, by which Weigley is fully secured. The answer further insists that he has paid Mrs. Storey all but $19,000 of the $275,000 he was to pay her, and for which balance of $19,000 he is personally liable. It is further charged in the answer that complainants contributed only the sum of $172,500 towards their payment for the capital stock of the Times Company issued to them, and insists that all the other money and property represented by the stock of the Times Company was contributed and paid for by himself out of his personal funds and money borrowed by himself. The answer further admits that the property of the Mail Company was transferred and delivered to the Times Company, and Times Company stock issued therefor to the holders of Mail Company stock, as alleged in the bill. Denies that there was any agreement between himself and complainants that the sum of $700,000 should be invested in the capital stock of the Times Company for the purchase of the property of the Storey estate, and for the paying of the debts, and furnishing means for the transaction of the business of publishing said newspaper. Denies that he made any statement of his assets to complainants, or any of them, before said purchase was made or agreed upon; and also denies that complainants were induced by any statement made by him to join with him in the purchase of the Storey estate. He insists that at the time he made the purchase of the Storey property he was fairly worth, in money and securities, over $200,000; all of which he invested, together with his credit, in the Chicago Times Company. Denies that any stock in the Times Company was issued to him without payment therefor. Admits that of the Storey estate property he retained a lot as charged in the bill, and that it is worth about $50,000, but subject to an incumbrance of $12,500; but states that, by an agreement between himself and complainants, such lot was to be the individual property of himself, in consideration of his services in negotiating the purchase of the Storey estate. Alleges that

he purchased the interests of Clinton A. Snowden, and that the 1,000 shares of the stock of the company subscribed for by Snowden, and which were unpaid for, were transferred in April, 1888, to himself and C. W. Boucher, and that the same were fully paid for by himself and Boucher. Admits the issue of over 1,000 shares of the capital stock of the Times Company by himself, as president of the company, over and above its authorized capital, but insists that such overissue was unintentional, and that he has been, at all times since such mistake was discovered, ready and willing to correct the same. Insists that he is now, and has at all times since the organization of the Times Company been, the holder and owner of a large majority of the stock of said company, and insists that complainants have never held or owned over 3,000 shares of said stock. Admits that he borrowed of Norman B. Ream and others $100,000, as charged in the bill, for which he gave his note, and pledged 5,001 shares of the Times Company stock to secure the payment of the same; but states that said loan represented two notes, of $50,000 each, given to the Storey heirs as part of the cash payment to said heirs at the time he purchased their interest in the property, and insists that he had paid said two notes with the proceeds of prior loans which he had made, but which were represented by the loan from Ream. Charges that Herman J. and Henry C. Huiskamp conspired and confederated with divers other persons to purchase said $100,000 note from the said Ream, together with the stock pledged as collateral security therefor; and illegally, and for the purpose of defrauding defendant West, caused said 5,001 shares of the capital stock to be sold; and the same is held, so far as the defendant is informed, by one Walter A. Halderman.

The cross-bill filed by the defendant West charges that the 5,001 shares of Times Company stock pledged to secure the payment of the $100,-000 loan of Ream was illegally sold, and prays a decree setting aside said sale, and allowing West to redeem the same on payment of the amount of indebtedness secured thereby; charging that said stock is now held by or for the said Herman J. and Henry C. Huiskamp, and that they alone are interested therein.

The testimony in the case upon the controverted questions is voluminous, and in many particulars contradictory, but from the proofs I find the following facts:

*First.* That in the summer or spring of 1887 defendant West began negotiations with the widow and heirs of Mr. Storey for the purchase of the property left by Mr. Storey, which had for several years been involved in litigation between the heirs and Mrs. Storey. That in the beginning of those negotiations he contemplated that A. O. Slaughter and Byron L. Smith, of Chicago, would be associated with him in the purchase of the property and the management of the Times newspaper. That in September of that year he proposed to complainant John N. Irwin to become associated with him in the purchase of said property, and that Irwin should use his influence to secure the co-operation of the other complainants with him in the enterprise; most of the complainants being at that time residents of Keokuk, Iowa, and being men

of wealth, and known to have ample money means within their con-
trol. Irwin soon succeeded in interesting the other complainants in
the scheme, and soon thereafter West had differences with Slaughter
and Smith as to the basis of ownership and control in the property,
in the event the purchase was consummated, and they withdrew from
any further participation in the proposed purchase. At this time
West had not succeeded in obtaining satisfactory terms from the
owners of the property. That, after the complainants had consented to
become interested in the scheme, he pressed his proposals for purchase
so satisfactorily that on the 29th of October, 1887, he obtained contracts
from the widow and heirs at law of Mr. Storey by which the heirs agreed
to sell and convey to him their interest in the estate for the sum of
$300,000,—$110,000 of which was to be paid in cash, and $190,000 was
to be paid by the reconveyance to the heirs of all the real estate, except
the lot and buildings occupied for the publication of the Times newspaper,
and the lot known in the proofs and arguments of this case as the
"Boulevard Lot." By the contract with Mrs. Storey, her interest in the
property was purchased for the sum of $275,000 cash. That, from the
time defendant West proposed to complainants to take an interest in
such property, it was the agreement and understanding that while the
negotiations with the Storey estate should, for prudential reasons, still
be conducted in the name of West alone, yet such negotiations were for
the benefit of West and Clinton A. Snowden and the complainants, al-
though it was not until about the time the purchase was consummated
that the precise interest that the complainants should take and pay for
was definitely settled; but before the purchase was completed a definite
understanding had been reached that complainants were to take and pay
for three-tenths of the property so obtained from the Storey estate, and
West and Snowden were to take and pay for seven-tenths of the interest
in the said property. That the cost of the property, exclusive of what
was paid by the reconveyance of real estate to the heirs, and including
$5,000 paid as commissions, was $390,000. That it was also agreed at
about the same time that the property so purchased should be conveyed
to and vested in a corporation to be organized by the parties to such pur-
chase,—that is, complainants West and Snowden,—and that three-
tenths of the stock in such corporation should be owned by complain-
ants, and seven-tenths should be owned by West and Snowden. That
it was also agreed that the stock of said company should be $1,000,000,
in shares of $100 each, and that full-paid stock should be issued, on pay-
ment being made, at the rate of $70 per share. That defendant West
paid the Storey heirs no money, but gave his notes for $110,000, and
secured the payment thereof by a trust-deed on an undivided seven-
tenths of the Times lot and building. That complainants, to enable
West to complete the purchase, paid him in the month of December,
1887, the sum of $150,000, and a short time thereafter paid him the
sum of $22,500; making a total cash payment made by complainants
of $172,500, which amount West used in paying Mrs. Storey. That he
gave Mrs. Storey his note for $40,000, and secured the payment of it by

a mortgage on the Boulevard lot, and paid her the sum of $62,500 in cash, which he had, at about that time, borrowed from several of the banks in the city of Chicago. That the Chicago Times Company was organized and directors elected on the 30th of December, 1887, with an authorized capital of $1,000,000, in shares of $100 each; and at a meeting of the directors of the company, held on the 5th of January, 1888, the company was authorized to purchase the Times lot and building and the Times newspaper for the sum of $850,000, to be paid for in that amount of the capital stock of the said company. That 7,499 shares of that stock were to be issued to West on behalf of himself and complainants, 1,000 shares were to be issued to Clinton A. Snowden, and 1 share to P. S. Weigley. That it was agreed, as part of the plan for organizing said company, that the property of the Chicago Mail Company should be purchased by said Times Company for $150,000, to be paid for by the issue of 1,500 shares of Times Company stock. That, in pursuance of said plan, defendant West received 800 shares of Times Company stock in exchange for 800 shares of Mail Company stock held by him; and that Clinton A. Snowden received 200 shares of Times Company stock in exchange for the same number of shares of Mail Company stock held by him; and that there was issued to complainants in the aggregate 375 shares of Times Company stock in exchange for the same number of shares of Mail Company stock held by them; and that there was also issued to defendant West, but without the knowledge or assent of complainants, 125 shares of Times Company stock, which the defendant West claimed he would exchange for the remaining 125 shares of Mail Company's stock still outstanding but which he has never so exchanged, and the said defendant West has always treated and dealt with said 125 shares of stock as if he were the owner thereof.

*Second.* That in April, 1889, the Times building and lot were sold by the Times Company, and that the proceeds of such sale, less prior incumbrances and commissions, amounted to $210,000. That there was an agreement between West and complainants that he should place $40,-000 of said proceeds in the treasury of the company for working capital, and that he might use the balance of said sum in the payment of such of his individual indebtedness as was secured or guarantied by any of complainants, but turning back to the company stock which he had issued to himself, at the rate of 60 cents on a dollar, for all the proceeds of said sale he should so use. That defendant West did take up and pay some of his own paper on which complainants, or some of them, were liable, but that he used the larger portion of said proceeds to take up the loans he had made at the time he purchased the property from the widow and heirs of Mr. Storey, and to pay the money which he used in paying Mrs. Storey.

*Third.* That in the month of April, 1888, West borrowed of the Gallatin National Bank of New York City the sum of $65,000, and secured said loan by the pledging of 5,001 shares of the stock of the Times Company, and in the month of November of the same year he borrowed of said bank the further sum of $35,000; making a total loan of $100,000 from

the said bank, upon which said 5,001 shares were pledged as collateral security. That in the forepart of July, 1889, the Gallatin National Bank demanded payment of this loan, and, in order to make such payment, West obtained a loan of $100,000 from Norman B. Ream and certain other persons, and pledged with Ream, as trustee for himself and associates, the said 5,001 shares of Times Company stock. In the latter part of August, 1889, complainants Herman J. and Henry C. Huiskamp, learning that said stock was so pledged, and that owing to the financial embarrassments of West there was danger that said stock would be sold, and thereby a majority of the stock of the Times Company might go into the hands of an innocent and *bona fide* holder as the genuine and full-paid stock of said company, purchased said note, and received therewith the stock pledged to secure its payment; and afterwards, without notice to the defendant West or demand of payment, caused the stock to be sold, and the same was purchased in the name of C. W. Fairbanks, but really in trust for H. J. and H. C. Huiskamp, who are now the beneficial holders thereof. That, by the terms of the pledge given by defendant West at the time he put said stock as security with said Ream, the stock could be sold, without notice, in case of default in the payment of said note at maturity, or in the event of such security depreciating in value. That said note was not due at the time such sale was made. That defendant West did represent to said complainants, during the time negotiations were going on between himself and complainants in relation to the purchase of the Storey property, that he was fully able to take and pay for his seven-tenths of the purchase price of said property, and that he had means to the extent and value of $365,000; but, in fact, defendant West was at that time not worth to exceed $50,000 in available assets, aside from his interest in the stock of the Chicago Mail Company; and that he paid only a very small part of the purchase money of said property out of his own means; nor did he pay into the Times Company, or contribute to its capital, to exceed the sum of $33,000 from any property or means he owned at the time such purchase was made.

*Fourth.* That the Times newspaper was turned over to the possession of the Times Company subject to a floating indebtedness of $89,441.69, which had been incurred by the receiver of the Storey estate during the time the litigation had been pending between the widow and heirs of Mr. Storey. That from the time the Times newspaper came under the control of the Chicago Times Company up to the 1st of April, 1889, the indebtedness of said company had increased to the sum of over $268,-000, aside from the liability of the company on the 125 shares wrongfully issued by West to himself and the overissued stock; and that during the time West was in the management of the said company as its president, he overissued stock of said company to the amount of 1,250 shares, some of which, it would seem from the proof, have been pledged or sold by West to holders in good faith for value.

*Fifth.* That the defendant West has purchased from the said Snowden the entire interest which Snowden had in the Times Company, but that there is no proof that Snowden ever contributed or paid any money or

property to the capital stock of the Times Company, except his 200 shares of Mail Company stock, for which he received 200 shares of Times Company stock, which was sold by him to West.

It will be seen that the essential basis of the organization by West and the complainants of the Times Company was that West should contribute the sum of $490,000, and complainants should contribute the sum of $210,000, which at $70 per share would entitle West to 7,000 shares, and complainants to 3,000 shares, of the capital stock of said company. Deducting from this amount the Times Company stock to be issued to the respective parties for their Mail Company stock, we find that West was to pay in cash $390,000, and complainants were to pay in cash $172,500; which was $172,500 more money than was required to pay the Storey heirs and Mrs. Storey. The conclusion must therefore be that the parties intended that this sum of $172,500, so to be paid in, should be for working capital of the Times Company. I say that must be the conclusion, because complainants paid in $55,500 more than their three-tenths of the purchase money going to the Storey estate, and because the plan for the issue of the stock absorbed the entire authorized capital of the company, and left no other means for raising working capital; and the court will presume that capable business men, as all these contracting parties are shown to be, knew that, as they took the Times newspaper loaded with nearly $90,000 of receiver's debts, a sufficient fund in the treasury to pay off the receiver's debt, and give the company a basis for credit in its current business, was absolutely necessary. This conclusion is also confirmed by the fact that, in his dealings with the Storey heirs, defendant West only assumed to incumber seven-tenths of the Times building and lot. The fact that complainants paid their quota in full is also conclusive evidence to me of their understanding of the plan, and of what they were to do, and of what West gave them to understand that he could and would do in the matter, by advancing means for putting the company in working condition. The inexorable conclusion from these facts is that, in order to entitle the defendant West to these 7,000 shares of the capital stock of the Times Company, he should have paid in or contributed to the capital of the company the full sum of $490,000. One hundred thousand dollars of this amount may be said to have been paid by the Mail Company stock to the same amount owned by West and Snowden; West having acquired Snowden's interest. This would leave the sum of $390,000 to be paid by West in cash. While it was an essential part of the agreement by West with his associates that he should pay in his whole amount, and they had acted on his assurances of his ability to do so, and anything short of that would be a breach of his agreement in that regard, and perhaps, if acted upon before other rights had intervened, would have entitled complainants to the rescission of the whole agreement, yet, as they allowed him to proceed and issue stock to himself without stint, which the proof shows they or some of them knew he was selling and hypothecating to *bona fide* holders, I can only conclude that, as between complainants and West, he must be held to have had

the right to issue as much stock as he paid for at the rate of $70 per share. The question, therefore, is, how much do the proofs show West to have contributed to the stock of the capital of the Times Company? It is obvious that, if West had paid his seven-tenths of the purchase price of the Storey estate property, which was $273,000, he would have been entitled to stock at the rate of $70 per share for that sum, amounting to 3,900 shares. As I have already said, he paid no money to the Storey heirs at the time he made the purchase, and only paid Mrs. Storey $62,-500 in cash, all of which he had borrowed from Chicago banks. He claims that he repaid the banks all the borrowed money from his own means; but I conclude, from the proof, that he paid only $23,000 of this borrowed money from his own resources. That is, as I read it from the proof, he borrowed on the 29th of October, 1887, from the Commercial National Bank, $25,000; and there can be no doubt from the circumstances that this is the $25,000 paid by West to Mrs. Storey as earnest money at the time he closed the contract with her, and which was applied on the purchase money going to her. Twelve thousand dollars of that loan was paid January 3, 1888; and it is equally clear from the proof that this $12,000 came from the money paid in by complainants. This left $13,000 of that loan unpaid, and it remained unpaid at the time the proof was taken in this case; but it was secured by the pledge of a note of the Regan Printing Company, and guarantied by F. S. Weigley, which security was furnished by West; and as the bank must either lose this balance, or get it from West or the security he put up, he should be credited with payment for that amount. On the 24th of March, 1888, he borrowed $10,000 from the National Bank of Illinois, which he secured by the pledge of a note of the Western Publishing Company; and this note was paid June 8, 1888, by payment of the collateral. These are the only two items which I can find from the proof that West paid from his own means out of the large loans he made at or about the time Mrs. Storey was paid off. The remainder of these loans seem to have been arranged and carried along, secured by pledges of Times Company stock, or by indorsements in some form by some of the complainants and others, but, in fact, increasing to the amount of $21,000 paid Mrs. Storey on the $40,000 note, until the proceeds of the sale of the Times building property came into West's hands, in April, 1889, when this paper was mostly paid off from these proceeds. As the proceeds of the Times building did not come from West, and did form a part of the Times Company's capital, West should have no credit on his capital stock account from indebtedness paid from this source. In fact, the capital stock of the company should have been reduced at the rate of $70 per share for the amount of the proceeds of the building, when the building was sold, and its proceeds applied either to the payment of West's debts or the floating debt of the company, because it was a withdrawal of so much of the capital of the company.

. I do not deem it necessary, in the view I take of the character of these proceeds as they came into West's hands and were used by him, to seek to ascertain and decide from the proofs what part of these proceeds West

applied to the payment of his individual debts, and how much he applied to the payments of the debts of the Times Company, as I deem it sufficient to say that I am satisfied from the proofs that he used enough of the proceeds to pay off substantially all the money he had borrowed to pay for Mrs. Storey's interest, except the $23,000 I have just spoken of; so that the manifest effect of the transaction is that West only paid $23,000 out of his own means or credit for Mrs. Storey's interest. The proof shows that in May, 1888, which was soon after all the paper given to the Storey heirs had matured, West borrowed $65,000 of the Gallatin National Bank of New York City, and on the 8th of October, 1888, he borrowed from the same bank the further sum of $35,000; making, in all, $100,000. And, while the proof is not quite conclusive, I think it shows that he applied this $100,000 loan to the payment of these notes to the Storey heirs; the $10,000 note given to the Storey heirs having been secured by F. S. Weigley by an arrangement between himself and West, and paid or in some way satisfied by Weigley. It will be remembered that the entire credit obtained from the Storey heirs was $110,000. Of this West has paid off $100,000, leaving $10,000 yet unpaid, but for which Weigley stands as security. As the $10,000 assumed by Weigley was so assumed on the credit West had with him, West should have credit on his capital stock account for this $10,000, which makes a total credit to West on the capital stock account of $33,000, which, at $70 per share, would give him the right to issue to himself 471 shares of Times Company capital stock. Add to this 1,000 shares of Mail Company stock held by West and Snowden, and it makes 1,471 shares of Times Company stock properly issued to West; this being all the stock West has actually paid for by payments on the property purchased of the Storey estate, and all the stock he had any right to issue to himself.

This leaves for consideration the condition of the 5,001 shares of stock issued by West to himself, and pledged first to the Gallatin National Bank, and afterwards to Ream, as trustee for himself and associates, who had loaned the money to West to take up the Gallatin Bank loan. If West had fully paid for the property purchased of the Storey estate out of his own means, or even secured the payment with means of his own, he would undoubtedly have had the right to have issued to himself 3,900 shares of stock, representing his seven-tenths of the purchase money of the Storey estate. In other words, if he had paid his seven-tenths of the purchase money to the Storey estate, which was $273,000, he would have been entitled, at $70 per share, to 3,900 shares of stock, and there would only be due from him $17,000 to make him equal with the complainants, and pay up for his 7,000 shares of stock. But, as has been before stated, this $100,000 loan and the $33,000 represent all that West is entitled to have credit for towards the payment of the purchase price of the Storey estate property; the remainder of the purchase price having been paid from funds furnished by complainants, and the proceeds of the Times building. If West had paid this note to Ream, he could rightfully claim that it represented payments by him on account

of the purchase of the Storey estate property at $70 per share, which would have entitled him to 1,428 4-7 shares, and he may be considered as having the right to pledge these 1,428 4-7 shares to secure this note, if he had not already had stock issued to him representing that payment.    But we find, on examining the proofs, that he had already received, aside from this block of 5,001 shares, 2,798 4-7 shares of Times Company stock, which he has pledged or sold to others..   The proof, then, makes West entitled to an issue of stock as follows:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| On account of Mail Company stock, 1,000 shares, | | | | | - | 1,000 | shares |
| For $133,000 paid, or for which he is still liable on account of Storey property, | - | - | - | - | - | 1,900 | " |
| Bought of Phillips, | • | • | • | • | • | 71 | " |
| Making, | - | • | - | - | - | - | 2,971 | shares |
| Deducting stock issued, | | • | • | • | - | 2,798 4-7 | " |
| Leaves, | - | - | • | • | • | - | 172 3-7 shares |

This leaves 172 3-7 shares more than what had been issued to him, and for which he may be said to have paid.    He is also entitled to a credit for 819 shares of stock returned to the company, which, added to these 172 3-7 shares, shows him entitled to a total credit of 991 3-7 shares, which is not sufficient to cancel the 1,250 shares overissued, and the 125 shares which he wrongfully issued to himself on account of Chicago Mail Company stock.

The proof shows that from the time West began his negotiations with complainants, which resulted in their taking an interest with him in the purchase of the Storey estate, he was a large borrower of money, especially for a man who testified that he then had over $365,000 in available means and securities.    That he largely increased his borrowing at about the time the purchase was consummated.    That those borrowings had continued up to the time of his financial collapse, about the 1st day of July, 1889; the pressure being to some extent relieved by the money which came from the sale of the Times building, and which he used, but even after the use of those proceeds he was left heavily in debt. That he lived extravagantly for a man in his circumstances; bought an expensive house, and furnished it expensively; and the heavy interest he must have paid in carrying these bank loans, added to what he put into his house and furniture, fully accounts for all the money traced by the proofs to his hands, during the interval, without crediting him with further payments on account of his capital stock in the Times Company than I have already given.    And the fact cannot be argued away that he undertook to float his share of the Times enterprise without any adequate means to justify such an undertaking, and simply failed, as might have been anticipated, in the undertaking.    It is also apparent from the proof that the Times newspaper had been losing money during the receivership, which had continued about two and one-half years; so that when West and his associates took the property it was subject to a debt of about $90,000; and that under the management of West this debt was nearly trebled in a year and three months.    And this fact sufficiently

refutes the claim, made on behalf of West, that he had contributed large sums from his own means towards the working expenses of the newspaper. During all the time from the 1st of January, 1888, to the 1st of July, 1889, West was business manager of the Times Company, and gave directions as to most of the important entries upon its books; and, although the books show large credits to West for payments made by him for the company, most of those credits are mere fictions of bookkeeping, and fail to show, when examined in the light of the evidence, that he actually advanced any considerable amount to aid in carrying on the business of the paper. The proof shows that West retained the property purchased of the Storey estate, called the "Boulevard Lot," which was then worth $40,000 over the $12,500 incumbrance; and on his representation that it was worth only $10,000 or $12,000, and his suggestion that he ought to be allowed to keep it as some compensation for his work in negotiating with Mrs. Storey and the Storey heirs, complainants, not knowing anything in regard to the value of the lot except what was told them by West, acquiesced in his claim. But it is very clear, from the proofs, that, if he had told them the truth about the value of this lot, they would not have so acquiesced. It does not appear that it was intended by any of the parties that this lot should be conveyed to the Times Company, but it was a piece of property which should have been divided between West and complainants in the proportions of three-tenths to complainants and seven-tenths to West; but, as the proofs also show that West has incumbered this lot to secure his own debts to an amount far exceeding its present value, I conclude that complainants are entitled to a decree against West for three-tenths of the present value of this lot.

As to the cross-bill of West, by which he seeks to redeem the 5,001 shares of stock from H. J. and H. C. Huiskamp, I need only say that as there is still an overissue of stock outstanding to more than equal any interest West can possibly have in the 5,001 shares, and as the proof shows that the overissued stock has been sold or pledged by West under such circumstances as to make it probable that the company may be compelled to treat it as valid, he is not entitled to any relief on his cross-bill. I will, however, add in this connection that it is a conceded fact that, after the Huiskamps had purchased the Ream note and stock collateral, they caused the collateral to be sold without any notice to West or demand of payment of the note; and I think that under the law of Illinois, which must govern in a case like this, the pledgee could not make sale of the collateral until after the default in the payment of the note, without notice and demand of payment to the pledgeor. *Bank* v. *Baker*, 128 Ill. 533, 21 N. E. Rep. 510. A decree may therefore be prepared finding that the entire issue of the 5,001 shares of stock pledged to Ream was illegal, and that said stock was never paid for, and should therefore be canceled; and finding, also, that complainants are holders of 3,000 shares of stock of said company taken and paid for by them, and by his fraudulent conduct towards the complainants as his associates in the purchase of the property of the Storey estate, and in the

organization and management of the Chicago Times Company, defendant West is not, in equity or justice, entitled to any further issue of the stock of said company on the basis of $70 per share, or on any other basis; and dismissing his cross-bill for want of equity.