WEST v. HUISKAMP et al.

(Circuit Court of Appeals, Seventh Circuit. October 1, 1894.)

No. 36.

1. CORPORATIONS—RIGHTS OF SUBSCRIBERS TO STOCK.
Complainants and defendant W. entered into an agreement by which W. was to purchase the T. newspaper, he furnishing seven-tenths and complainants three-tenths of the purchase price; and a corporation was to be organized to publish the paper, stock in which was to be issued to the parties in proportion to their contributions to the purchase price. Complainants advanced their proportion in cash, W. purchased the newspaper property, and transferred same to the corporation upon its organization, and became president and general manager. Upon a bill alleging that W. had falsely represented to complainants that he was financially able to carry out his part of the agreement, whereas he was insolvent; that the only cash used in the purchase was that furnished by complainants; that W. had obtained credit for the balance of the purchase money upon his notes, which he afterwards paid with funds of the corporation misappropriated by him as president; that he had caused stock to be illegally issued, and had appropriated stock without paying for the same; and praying for cancellation of the stock illegally issued, and for a declaration that complainants were the only purchasers of the newspaper property, and the only owners of the stock of the corporation,—*held*, that W.'s misrepresentation of the value of his property could not affect the validity or ownership of the stock; that it was no objection to W.'s title to the stock issued for the newspaper property that he had obtained the property on credit, and not paid for it; that complainants did not become the sole owners of the stock, or their shares the only valid shares, because they alone paid what was paid for the property; that there should be a reference to a master to ascertain the

exact rights of the parties, arising from W.'s issue of illegal stock or otherwise; and that upon proper findings there might be a decree canceling shares standing in W.'s name, but not upon the ground merely of his misappropriation of money or credits of the company.

2. FRAUD—SUFFICIENCY OF PROOF.
The bill also alleged that a piece of real estate bought by W. with the newspaper property, but forming no part of it, had been retained by him. No fraud, misrepresentation, mistake, concealment, or breach of trust was alleged or proved, and it appeared that complainants knew of W.'s retention of the lot. *Held* insufficient to sustain a decree in complainants' favor against W. for three-tenths of the value of the lot.

Appeal from the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

This was a suit by Herman J. Huiskamp, Henry C. Huiskamp, Cyrus E. Phillips, George D. Rand, John N. Irwin, and John Williamson against James J. West, Charles E. Graham, James A. Fullenwider, Chauncey W. Boucher, and the Chicago Times Company, and cross bill by James J. West against Henry C. Huiskamp, Herman J. Huiskamp, John N. Irwin, George D. Rand, Cyrus E. Phillips, Frank S. Weigley, Joseph R. Dunlop, William Henry Smith, C. W. Fairbanks, Walter N. Haldeman, and the Chicago Times Company, to determine the ownership of certain shares of corporate stock. Complainants obtained a decree, and the cross bill was dismissed at the hearing. 47 Fed. 236. Defendant West appeals.

John N. Jewett, L. H. Bisbee, and William Brown, for appellant. Trumbull Willits, Robbins & Trumbull, A. W. Bulkley, and E. E. Gray, for appellees.

Before HARLAN, Circuit Justice, and WOODS, Circuit Judge.

WOODS, Circuit Judge. This suit was brought by Herman J. Huiskamp, Henry C. Huiskamp, John N. Irwin, George D. Rand, and Cyrus E. Phillips, citizens of Iowa, and John Williamson, a citizen of New York, against the appellant, James J. West, and others, citizens of Illinois, for the purpose of obtaining a decree which should determine the ownership of the stock of the Chicago Times Company, a corporation organized under the laws of Illinois, direct the cancellation of illegal stock, and, pending the suit, enjoin the defendants against transferring or assigning stock, and against interfering with the publication or management of the newspapers known as the Chicago Times and the Chicago Mail. The averments of the bill are numerous and prolix, but the substance is that the complainants, together with E. M. Irwin and M. M. Phillips, are owners of shares of stock in the Chicago Times Company, in amounts stated, aggregating nearly 3,000 shares out of a total of 10,000 shares; that on the 1st day of December, 1887, the estate of Wilbur F. Storey, including the Chicago Times, was in the possession of Horace A. Hurlbut, as receiver, who in that capacity was conducting the publication of that paper; that about that time the complainants, with West and Clinton A. Snowden, "for the purpose of obtaining such publication, known as the Chicago Times, entered into an arrangement or agreement whereby West and Snowden were to become

the purchasers, if possible, of the various conflicting interests in the estate of Wilbur F. Storey, deceased, and thereby become the owners, for and on behalf of themselves and your orators, of all the property of said estate, * * * including said Chicago Times," it being further agreed that as soon as the purchase could be consummated a corporation should be formed for the purpose of publishing the Times newspaper, the stock of which corporation should be owned by the complainants and by West and Snowden; that the parties to the agreement, or a majority of them, were stockholders in the Chicago Mail Company, a corporation of Illinois, which was engaged in publishing the newspaper known as the Chicago Mail, the capital stock of which company was $150,000, divided into 1,500 shares, of which West owned a majority, and, that stock being of par value, it was agreed that the property of the Chicago Mail Company should be transferred to the proposed Chicago Times Company, and stock of the new company issued, share for share, to the holders of the stock of the Mail Company; that, pursuant to the arrangement, West and Snowden did thereafter purchase from the widow and heirs the entire Storey estate, including the Chicago Times, and on or about the 24th of December, 1887, West received a conveyance thereof for himself and the other parties named, the purchase price being to the widow $275,000, to be paid in cash, and to the heirs $300,000, to be paid $110,000 in cash, and the remainder, $190,000, by the conveyance to the heirs of a portion of the landed estate which had been conveyed to West; that on the 30th of December, 1887, the organization of the Chicago Times Company was completed by the election of directors, and by the issue and recording on the next day of final articles of incorporation; that, on the ensuing 5th of January, West was elected president and treasurer of the company, Snowden was elected secretary, and by-laws were adopted, defining their duties and powers, and fixing the salary of West, as president and general business manager, at $10,000, and of Snowden, as secretary and managing editor, at $5,000; that on the same day, pursuant to the agreement hereinbefore set forth, the board of directors authorized the president and secretary "to purchase from West the real estate known as the 'Chicago Times Building,' together with all the personal property therein contained, and the publication known as the Chicago Times, with all its press franchises, rights, and good will, and all the property used in the printing and publication of said newspaper, for the sum of $850,000, to be paid for in the stock of said company, to be issued, one share to Frank S. Weigley, one thousand shares to Clinton A. Snowden, and seven thousand four hundred and ninety-nine shares to James J. West, the said West receiving a portion of said shares for and on behalf of your orators, as hereinbefore more specifically set forth; that soon thereafter the said James J. West transferred, conveyed, and delivered said property to the said Chicago Times Company, and the said the Chicago Times Company issued stock therefor pursuant to said resolution;" that about the same time the Chicago Times Company purchased the property, rights, franchises, good will, and effects of the Chicago Mail Com-

pany, and the same were transferred and delivered in consideration of the issuing by the Times Company to the stockholders of the Mail Company of the stock of the Times Company, share for share, since which time the Times Company has continued the publication of the Chicago Mail; that West issued to himself 125 shares of stock in the Times Company, in exchange for Mail stock, more than he was entitled to receive, the rightful owners thereof never having surrendered their shares in the Mail Company in exchange for shares of the Times Company; that the stock owned by M. M. Phillips (321 1/7 shares) was originally issued to Cyrus E. Phillips, who transferred the same, and that the shares of the other complainants, Huiskamp, Irwin, and Rand, "were issued to them in consideration of moneys advanced and property of the Storey estate bought for and on their behalf, and transferred to the said the Chicago Times Company;" that it was then and there agreed between them and West, as promoters of the enterprise, that the sum of $700,000 should be invested for the purpose of purchasing said Storey estate, and giving to the proposed corporation sufficient capital to transact its business, and pay its debts theretofore contracted by the receiver of the estate, of which amount the complainants agreed to furnish three-tenths and West agreed to furnish seven-tenths; that before entering into the agreement they required West to give them a statement of his assets, to enable them to determine whether he was financially able to carry his part of the burden; that West then and there made to them a statement showing that he was worth $365,000 in good securities, bonds, etc., and relying on that statement they made the agreement, and did then and there furnish West the sum of $150,000, and afterwards, in full performance of the contract on their part, furnished him the further sum of $22,500, of which the complainant Williamson contributed $7,000, and thereby became "part owner of the three-tenths interest in said Storey estate and Chicago Times Company originally agreed to be purchased by your orators other than said Williamson;" that West did not contribute any money of his own to the purchase of said paper and estate; that he had no money of his own to contribute, and was then insolvent; "and that instead of paying for the same as he agreed to do, and as he informed your orators he had done," he obtained from the Storey heirs credit for the full amount of $110,000 which was to have been paid them, giving therefor the promissory notes of himself and Snowden; that West still owes the heirs $10,000, and the remaining $100,000 he paid, not with his own means, but out of moneys obtained of the complainants, and moneys belonging to the Times Company; that, of the $275,000 which he agreed to pay Mrs. Storey, all that was paid at the time of the purchase West obtained of complainants, or borrowed from others, and repaid the loan out of the Storey estate; that he still owes the widow $19,000, the remainder having been paid out of the proceeds of the Times property; that, before and at the time of the formation of the Chicago Times Company, West falsely represented to complainants, and caused them to believe, that his personal indebtedness was not large, and would soon be liquidated, when in

fact, as he knew, he was insolvent; that in 1889 the Times Company sold the Times building for $220,000, which was received by West, and deposited to the credit of the company; that at that time West represented that the company was indebted to the amount of $40,000 only, and it was then agreed that the proceeds of the sale should be used to pay all the existing debt, $40,000 should be placed to the company's credit in bank, and the remainder applied to the individual indebtedness (of West) guarantied by any of the complainants, for which amount stock should be delivered to the company, the balance to be used by the company in the purchase of stock from West at 60 cents on the dollar; that, instead of $40,-000, the indebtedness of the company was upwards of $250,000, a part of which was subsequently paid out of the proceeds of the sale of the building; that more than $100,000 of the amount West, as president, checked out and applied on his individual account, when the company owed him nothing, and he was largely indebted to the company, and that only a part of the guarantied indebtedness was paid; that, of the stock issued by the Times Company to West, only that issued in exchange for his stock in the Chicago Mail Company has been paid for by him; that the purchase price of the Storey estate, less the land reconveyed to the heirs, was $385,000; that West retained a tract of land of the value of about $50,000, and transferred the balance of the property to the Times Company, thereby transferring to the company property which he purchased for himself and orators at the price of $380,000, to pay which he used the money paid in by complainants, the proceeds of the sale of the building, and other funds of the Times Company; that on the 11th of July, 1889, West resigned the office of president of the company, and Herman J. Huiskamp became the president; that of the $1,000,000 capital stock of the Times Company, excepting the shares issued to orators, all shares were issued originally to West and to Snowden, except one share to Weigley, which was afterwards canceled; that Snowden transferred his shares to West; that neither West nor Snowden paid for any stock, except that received by each in exchange for his stock in the Mail Company, nor have any of the parties holding stock through West paid any consideration to the company therefor; that West and Graham, who had succeeded Snowden as the secretary of the company, issued certificates of stock in excess of the authorized capital to the amount of 1,000 shares and upwards, of which West has pledged portions to various banks and persons as security for his personal debts, and a portion he sold to the company in pretended execution of his agreement to sell the company stock at 60 cents on the dollar; that, of the stock of the company issued to himself, West has transferred 500 shares to Chauncey W. Boucher, and the remainder of his stock he has pledged, sold, and transferred, and is not now the owner or holder of any stock in the company; that in July, 1889, West obtained of Norman B. Ream, George M. Pullman, J. J. P. Odell, and the Union National Bank of Chicago, one or more of them, on his individual account, $100,000, for which he gave to Ream, as innocent holder

and as trustee for the other parties named, his promissory note, and, as security therefor, pledged with Ream 5,001 shares of the capital stock of the Times Company, issued by himself, as president of the company, to himself; that thereafter West assigned, transferred, and conveyed to complainants Rand and Irwin the said 5,001 shares of stock, subject to the lien of Ream, as collateral security for an indebtedness of West to Rand and Irwin of $64,000; that the defendants Fullenwider and Graham assert some interest in some of the stock of the company, but paid nothing therefor; that West and his co-respondents have made recent threats to take possession of the Times Company and property; that some of the fraudulent stock issued by West and Graham has been transferred to parties unknown; that a portion of the stock issued to West in consideration of the transfer of the Storey estate has been transferred by West, fraudulently and without consideration, to parties unknown; that by his conduct West has brought into danger of forfeiture the Times Company's right in the franchise of the Western Associated Press Association, and the forfeiture will be insisted upon if West and his associates are permitted to control the affairs of the company.

The prayer of the bill is for a decree finding what stock is fraudulent and void, and ordering a cancellation thereof, and that complainants be declared to be the only purchasers and owners of the Storey estate and of the capital stock of the Times Company purchased by the transfer of the estate to the company, etc.

West answered, controverting largely the averments of the bill, and filed a cross bill, seeking affirmative relief, chiefly against an unauthorized sale to the complainants of the 5,001 shares of stock which had been pledged to Ream.

To the cross bill the complainants answered, reaffirming in substance the averments of the bill, and admitting the sale to themselves of the pledged stock without previous demand on West for payment of the debt. There was the usual replication to the answers to the bill and cross bill, respectively. The circuit court entered a finding for the complainants in substantial conformity with the bill, and, further, that West represented to the complainants that "the boulevard lot" was a small building lot worth only from ten to twelve thousand dollars, and plaintiffs, knowing nothing of its value, and believing the representation true, consented that West should retain the lot as compensation for his services in negotiating the purchase of the Storey estate, when in fact the lot was worth $50,000, less an incumbrance of $12,500; and accordingly the court decreed that the complainants and their assignees are the owners and holders of 3,000 shares of the capital stock of the Chicago Times Company; that the entire issue of 5,001 shares, represented by certificates numbered 11 and 23, was illegal, and should be canceled, subject to the rights of the purchasers of the note for which the stock was pledged, and that West has no title or interest therein; that West, by his fraudulent conduct towards the complainants and his associates in the purchase of the Storey estate, and in the organization and management of the Chicago Times Company, has

forfeited all right, in equity or justice, to any further issue of stock on the basis of $70 per share, or upon any other basis; that the complainants do have and recover of the defendant West the sum of $13,587.50 as and for their three-tenths interest in the boulevard lot appropriated by said defendant, together with costs in this proceeding to be taxed, and that they have execution therefor; and that the cross bill of West be dismissed, at his costs. For the finding and opinion of the court, see 47 Fed. 236.

The evidence in the record being too voluminous, and the discussions of counsel too elaborate, to admit of detailed review, or even synopsis, we shall make only a brief statement of our views and conclusions. We are of opinion that in important particulars this decree is erroneous.

If it were true, as the bill charges, that West made to the complainants a false statement of the value of his property, the fraud, upon discovery, might doubtless have been made cause for a rescission of the contract of the parties, or, after the Times Company was organized, for the winding up of the affairs of that company, but in respect to the issues of this case the alleged misrepresentation seems to be quite immaterial and irrelevant. It in no manner affects the question either of the validity or ownership of shares in the capital stock of the Chicago Times Company. It is clear, too, that the complainants were not materially deceived or misled by any representation which West is accused of having made. In order to prove the alleged representation false, it is insisted in one of the briefs for the appellees that West's letters to John N. Irwin, written on and before the 10th of November, 1887, "establish the fact that he was hard pressed for money, and could not have been worth $365,000, as he stated to Huiskamp and Irwin, or $200,000, as he now claims." Irwin therefore had notice of West's embarrassed condition, and his relation to his associates was such that notice to him was notice to them.

In respect to the boulevard lot, the finding of the court goes beyond the averment of the bill, which is simply that "West retained a tract of land of the value of about $50,000." No fraud, misrepresentation, mistake, concealment, or breach of trust by West, nor lack of knowledge on the part of complainants, is alleged, and the proof is that the lot was retained by West with the consent of complainants. No cause of action in this particular is alleged in the bill, and none is proven. The complainants neither had nor expected to acquire an interest in the Storey estate, as such, or in West's contract of purchase. Their aim, from the first to the end of the negotiation, was to obtain, as they did, an interest in the proposed Chicago Times Company, owning the Times newspaper, presses, etc., and the Times building, and not other parts of the Storey estate. To enable West to complete his purchase, they advanced him money, for which they were to have, and afterwards received, credit on the price of their shares of stock in the company which was organized. They took receipts from West showing that the moneys they advanced were to be applied "on purchase of the Storey estate," "to the purchase of the Chicago Times and the Storey estate," and, in one in-

stance, "as part payment for a three-tenths interest in the contract made by Snowden and West for the Chicago Times and Storey estate, the said amount to be refunded in case the said contract is not consummated." But these expressions tend no more to prove an interest in the boulevard lot than in that part of the real estate which was reconveyed to the Storey heirs.

It remains to consider what were the rights of West in the capital stock of the Chicago Times Company. The controlling facts are few, and admit of little dispute. The contract of West and Snowden with the widow and heirs for the purchase of the Storey estate was made on the 29th of October, 1887. There had been previous negotiations between West and Irwin, looking to the taking of an interest in the purchase by the latter and his friends; but no definite or binding agreement in that direction was reached before the 17th of December ensuing, when West and Snowden signed and delivered to Henry C. Huiskamp the writing of that date, which, signatures omitted, is of the following tenor:

"We, the undersigned, owners of contracts now existing for the conveyance of the Chicago Times, hereby agree to organize a company under the name and title of the Chicago Times Company (notice of incorporation of said company having already been given) on the following basis: Seven-tenths (7/10) of the stock to be owned by James J. West and C. A. Snowden, of Chicago, and three-tenths (3/10) by the following named parties collectively: John N. Irwin, C. E. Phillips, George Rand, H. C. Huiskamp, and H. J. Huiskamp, all of Keokuk, Iowa, and John Williamson, of New York. And it is further hereby agreed by all parties herein named that the stock of the Times Company shall be issued only for the amount actually paid in by each stockholder at the rate of eighty-five dollars ($85) per share, and that the residue of the stock of said company, if there be any, shall, after all debts have been paid by the company, be distributed and paid in the following proportion: James J. West and C. A. Snowden, seven-tenths (7/10) and John N. Irwin, C. E. Phillips, H. C. Huiskamp, H. J. Huiskamp, and George Rand, of Keokuk, Iowa, and John Williamson, of New York, three-tenths (3/10) of same."

Until accepted or acted upon by the complainants, that writing perhaps amounted to no more than a proposition on the part of the signers; but it was accepted and acted upon, as the evidence shows, except that it having been determined afterwards that a mortgage for $145,000 upon the Times building should not be paid off, but should be carried by the Times Company, the price of the stock to be issued was reduced from $85 to $70 per share; and on that basis the complainants, having advanced $172,500 cash, and owning Mail stock to the amount of $37,500, which seems to have been treated as cash, were entitled to receive, and did receive, for the whole sum of $210,000, 3,000 shares of stock. Deducting $10,000, which, according to the testimony of West, was the price of the boulevard lot, the property of the Storey estate, which on December 24, 1887, was conveyed to West, and which on the ensuing January 5th he conveyed to the Chicago Times Company in consideration of 8,500 shares of stock, of which 1,000 shares were issued to Snowden and 7,499 shares to West, cost $380,000, of which, after deducting $172,-500 furnished by complainants, there remained $207,500, for which, by the agreement of December 17th, West was entitled to credit,

and to receive stock to the number of 2,964 2/7 shares. He also owned 1,000 shares of Mail stock, including 200 shares obtained of Snowden, worth $100,000, which, on the basis of $70 per share (which was allowed to complainants for their $37,500 of Mail stock), entitled him to 1,428 4/7 shares; making a total of 4,392 6/7 shares to which he was entitled upon the completion of the organization of the company, and the turning over of the property of the Mail Company. He afterwards acquired 1,000 shares of Snowden, of which 500 shares were transferred to Boucher; but whether payment for these shares was ever made either by Snowden or West we have not determined. The total number of shares of stock was 10,000, of which 3,000 were issued to complainants, 1,000 to Snowden, one to Weigley, and West in his own right was entitled to 4,392 6/7 shares; making a total of 8,392 6/7 shares accounted for, and leaving 1,607 1/7, for which, as president of the company, and under the agreement of December 17th, West was responsible and accountable as a trustee. To these add 1,250 shares, which it is conceded were issued by West in excess of the total capital stock of the company, as limited by the articles of incorporation, and we have 2,857 1/7 shares unaccounted for; but, if these be deducted, there remain 1535 5/7 of the 4,392 6/7 shares to which West was originally entitled.

It is no objection to West's title to stock issued in consideration of the property turned over to the company that he obtained the property on a credit, and had not paid for it; and if afterwards, in breach of his trust as president and manager, he used the money of the company to pay the debts so incurred, he became thereby indebted to the company. And, by reason of the trust relation, it has been suggested that the company became entitled to a lien upon the stock for its reimbursement; but it is not true, as contended by the complainants, that they became sole owners of stock, or their shares the only valid shares, on the theory that they alone had paid what was paid for the property which was transferred by West to the company, and for which the company's stock was issued. They bargained for three-tenths of the stock, and that they got; and if, by reason of West's misappropriation of the moneys of the company during the year and a half of his management, the value of their stock has been impaired, it does not follow that West's stock, in so far as it was valid when issued, should be annulled or declared void.

We have not attempted to determine the exact rights of the parties in any particular. There should be a reference to a master for that purpose. To the extent that West has issued illegal stock, or has appropriated stock without paying for it, or has failed to surrender shares under his agreement to surrender them for cancellation at 60 cents on the dollar or otherwise, the court may, on a proper finding of the facts, decree a cancellation of shares which stand in West's name, or were issued to him, saving the rights of innocent purchasers; but there should be no such cancellation on the ground merely of misappropriation by West of the moneys or credits of the company during the term of his presidency and management.

Upon the cross bill, which shows that the complainants, or some of them, had procured an illegal sale, and had become purchasers of the stock pledged to Ream, West was entitled to have the illegality of the sale declared.

The decree below is therefore reversed, and the cause remanded for reference, on the proofs in the record, to a master, who shall report his conclusions of fact and law upon the several matters in dispute.